QUESTIONS PRESENTED AND CONCLUSION Question: What is the meaning of "one-half of a term" as used in Article V, Section 3(2)? In particular, how does one determine whether a person appointed or elected to fill a vacancy in the House of Representatives or the State Senate served "at least one-half of a term"?
The request also asks that I address "whether the partial terms served by Senator Joan Fitz-Gerald and Senator Lois Tochtrop should count as full terms for purposes of the term limit provisions in Article V, Section 3."
Answer: For purposes of the partial term provision of Article V, Section 3(2), a State senator serves "at least one-half of a term of office" if that person takes the oath of office on or before the first day of the third legislative session of the term being completed. Likewise, a State representative serves "at least one-half of a term of office" if that person takes the oath of office on or before the first day of the second legislative session of the term that is being completed. Under this definition, the partial terms served by Senator Fitz-Gerald and Senator Tochtrop count as full terms under Article V.
 BACKGROUND
Under the original 1876 Colorado Constitution, senators and representatives served a "term of two years." Art. V, § 3 (amended 1974). Senate terms were amended to a "term of four years" in 1974. Art. V, § 3(1). In 1990, Colorado voters initiated and passed an amendment to Article V, Section 3(2), imposing term limits on members of the General Assembly. Articles V, Section 3, now states:
Section 3. Terms of senators and representatives.
 (1) Senators shall be elected for the term of four years and representatives for the term of two years.
 (2) In order to broaden the opportunities for public service and to assure that the general assembly is representative of Colorado citizens, no senator shall serve more than two consecutive terms in the senate, and no representative shall serve more than four consecutive terms in the House of Representatives. This limitation on the number of terms shall apply to terms of office beginning on or after January 1, 1991. Any person appointed or elected to fill a vacancy in the general assembly and who serves at least one-half of a term of office shall be considered to have served a term in that office for purposes of this subsection (2). Terms are considered consecutive unless they are at least four years apart.
(emphasis added). This amendment, along with a similar amendment to executive branch terms, see Colo. Const. Art. IV, § 1, passed overwhelmingly with 71% of the vote.
For purposes of calculating when a person has served the maximum number of terms in office, Section 3(2) includes the above emphasized language stating that a partial term of "at least one-half of a term of office" shall count as a full term. As requested, this opinion attempts to define when a period of service constitutes "at least one-half of a term of office."
 DISCUSSION
Construing the phrase "at least one-half of a term of office" necessitates a defining of two separate concepts: (1) a legislative "term of office," and (2) what it means to serve "at least one-half" of such a term. In construing constitutional language, I must look first to the text of the Constitution. See Davidson v.Sandstrom, 83 P.3d 648, 654 (Colo. 2004). When the meaning of a constitutional provision is unambiguous, no further inquiry is necessary. Id. Only if a term is not clearly defined, either expressly or by the context in which it appears, are alternative methods of construction utilized. Id.
In the legislative context of Article V, a "term of office" is defined as both a "term of four years" for senators and a "term of two years" for representatives. Art. V, § 3(1).[1] Those phrases, in turn, are defined not as a fixed number of days, months or years, but rather as a period of time beginning upon "the convening of the first regular session of the general assembly next after [the] election," and ending upon the convening of the fifth (for senators) or third (for representatives) subsequent session. Art. V, §§ 3(1), 7. Within the parameters of this definition, the exact beginning date is determined by joint resolution of the General Assembly or, if the General Assembly fails to set a date, by the Executive Committee of Legislative Council, which is made up of the legislative leadership (the four highest ranking majority party members and the two highest ranking minority party members).
Because the General Assembly and its leadership have plenary authority to start a session anytime between January 1 and the second Wednesday of January, the exact number of days in a "term of four years" or a "term of two years" cannot be ascertained until shortly before that term expires when the General Assembly or the Executive Committee sets the start date of the final session in that term. Moreover, the number of days in any given term can vary by up to almost one month. A "term of four years" in the Senate can range from 1,447 days to 1,474 days, while a "term of two years" in the House of Representatives can vary between 716 and 744 days.[2]
Having defined a "term of office," the next question is what constitutes "at least one-half" of such a term. Because the phrase "one-half" is not defined in the Constitution, I must rely on other methods of construction, keeping in mind that the ultimate goal is to reflect the intent of the electorate adopting the amendment. See Bolt v. Arapahoe County Sch. Dist. No.Six, 898 P.2d 525, 532 (Colo. 1995). If the intent of the electorate is not clear from the language of an amendment, the provision at issue should be construed in light of the objective sought to be achieved and the mischief to be avoided by the amendment. See In theInterest of Y.D.M., 593 P.2d 1356, 1359 (Colo. 1979). I may not engage in a narrow or technical reading of language if such a reading would defeat the intent of the voters. See Grossman v. Dean, 80 P.3d 952, 962
(Colo. 2003).
The clearest expression of voter intent comes from the term limit provision itself. Its stated purpose is to "broaden the opportunities for public service" and to "assure that elected officials of governments are responsive to the citizens of those governments." Art. V, § 3(2) and Art. XVIII, § 11(1). These twin purposes were more fully described in the 1990 Blue Book sent to every registered voter. It states, inter alia:
 (1) Our founding fathers believed holding elected office was a public service to be performed only for a limited time. Today, however, we refer to some elected officials as "career" or "professional" politicians and many such officials view their positions as career or lifetime jobs. This careerism stems partly from the fact that incumbents seeking reelection nearly always win. Once in office for long periods of time, incumbents tend to lose touch with the interests of their constituents and focus more of their attention on issues over which they have gained power through the seniority system. The result is a system in which political participation is discouraged, office holders are unresponsive to constituents, and elected officials spend more time on election campaigns than they do on their duties as public officials. A return to a "citizen" government through the limitation of terms is the answer to this political congestion.
 (2) Long periods of service by public office holders does provide for experience but does not necessarily provide citizens with better lawmakers. Limiting terms of office will allow more individuals, particularly those with established professions or occupations outside of public office, the opportunity to serve the public. Broadening public service will invigorate the political system by making room for new policy-makers with new perspectives on addressing public policy issues. Realizing that terms of office are limited, public office-holders will be more productive, devote more time to their duties as elected officials, and will be more bold in political decision-making without fearing the potential impact of such decisions on future reelection efforts.
The documented history of the 1990 ballot measure echoes this sentiment. As part of this analysis I reviewed: (1) audio recordings of the February 21, 1989 hearing before the Title Setting Board at which the proposed ballot language was reviewed by representatives of the Attorney General's office, the Secretary of State and Legislative Legal Services; (2) the Staff Summary of the September 6, 1990 joint "review and comment" hearing of the Legislative Council and Legislative Legal Service Committee;[3] and (3) caselaw and attorney general opinions from other states with similar constitutional provisions.[4] While none of these secondary sources were helpful in defining "one-half" of a legislative term of office, the Blue Book and hearings all provide overwhelming evidence that the voters' intent in initiating and adopting term limits was to limit the disproportionate influence over the legislative process (perceived or otherwise) associated with "career" or "professional" politicians. As stated several times in the Blue Book, the central purpose of the term limits provision is to shorten terms of office, and thus the number of years and legislative sessions served by members of the General Assembly. Any interpretation of the partial term provision must reflect this intent. Seegenerally Opinion of Attorney General Ken Salazar No. 2000-05 (July 10, 2000) (when assessing voter initiatives, courts should "give effect to the likely understanding of the `average voter' and generally eschew subtle legal nuances").
In my view, there are two possible methods of determining when a legislator has served "one-half" of a term of office. The first method is to retroactively take the total number of days in the term and divide by two. If the legislator has served more days than this number, they have exceeded one-half of that term. The second method is simply to define the half-way point of a House or Senate term as the first day of the second or third session, respectively. Thus, if a senator is sworn in any time prior to the start of the third legislative session after being elected, such that the senator will ultimately serve during two of the four sessions in that term of office, he or she has served "at least one-half" of the term of office. Each of these methods is discussed in greater detail below.
1. Retroactively counting the number of days served and dividing by two.
As a method of calculating "one-half" of a term of office, counting the number of days served and dividing by two provides a certain degree of mathematical exactitude (at least in hindsight once the starting date of the final session is set). As a method of carrying out the purposes of the term limit provision, however, it is fraught with problems. As demonstrated through the examples below, this method creates uncertainty in determining how long a legislator can serve, provides an opportunity for the political party in power to manipulate the number of terms a legislator can serve, subverts the will of the voters by allowing someone who falls one or two days over an arbitrary line to serve four more years and four more legislative sessions, and ultimately fails to serve the voters' intent to limit the number of terms and years served by any one person.[5]
Example #1:
The chart below shows that Senator A was elected in November 2000 to fill the remainder of a term commencing on January 6, 1999. Senator A's partial term ran from January 10, 2001 (upon the convening of the General Assembly) to January 7, 2003, for a total of 728 days.[6]
Because the number of days in that full term was 1,463, a mathematical "one-half" is 731.5 days, which is less than 50% of the full term. Senator A's partial term would therefore not count as a full term, and he is eligible to serve two more four-year terms.

 Beginning of Beginning of End of term Days in full One-half of Days in partial
 full term partial term term days in full term served
 term
 Senator
 A Jan. 6, 1999 Jan. 10, 2001 Jan. 7, 2003 1463 731.5 728 (50%)
 Senator
 B Jan. 10, 2001 Jan. 8, 2003 Jan. 12, 2005 1463 731.5 735 (50%)

Like Senator A, Senator B also served two years of a four year term. The full term began on January 10, 2001, and the partial term began on January 8, 2003. The term ended on January 12, 2005. As was the case with Senator A, the full term was 1,463 days. But because of when each session started, Senator B's partial term was 735 days, which is mathematically greater than 50% of the full term (731.5 days). Thus, Senator B's partial term counts against her for term limit purposes, and she may only run for election once more.
The inconsistency and unfairness of this outcome is obvious. Because the 2003 session happens to start on January 8, Senator A may serve ten years, while Senator B is limited to six years. This is true even though both full terms are 1,463 days and both senators were elected during regular elections to fill the final two years of a vacant term.
Moreover, a person who was: (1) elected to the House of Representatives on the same day Senator B is elected, (2) sworn in on the same day as Senator B, and (3) completes his or her first term on the same day Senator B completes her partial term, will be eligible for eight years of service in the General Assembly while Senator B will be eligible for only six years.
Example #2:
Senator A begins a four-year term on January 12, 2005, but vacates the office in 2006. Senator B wins the vacancy election in November 2006, and begins a partial term on January 10, 2007. His term ends upon the convening of the General Assembly in 2009. If the legislative leaders start the 2009 session on January 1, the total number of days in the full term is 1,450, half of which is 725 days. Because Senator B's partial term is 722 days — three days less than the half-way point — the term does not count towards the two term limit. Senator B is therefore eligible to serve ten years.
If, on the other hand, the leadership in the General Assembly wishes to limit Senator B to six years in office, it can start the session anytime after January 8, 2009, because his partial term will then exceed one-half of the number of days in the full term. Thus, if the 2009 session starts on January 9, the full term is 1,458 days, half of which is 729 days. Because the partial term would then be 730 days, it is more than 50% of the full term and would count as a full term for purposes of the term limit provision.
This example demonstrates how the majority party in the legislature can, for purposes of political gain, manipulate the length of a fellow legislator's time in office. This allows the controlling party to further strengthen its majority position by either: (a) helping an incumbent member of that party retain that seat, or (b) creating an open seat that would otherwise be held by a member of the opposite party. While there is no evidence of any attempt to manipulate the terms of Senator Fitz-Gerald or Tochtrop, such results are possible if we rely upon a "number of days served" methodology to determine when a legislator's partial term constitutes a full term. It is incontrovertible that the voters did not intend such results.
2. Using the first day of the second or third session to determine if a partial term constitutes "at least one-half" of a term of office.
The alternative method is to define "at least one-half" of a term as any term that begins on or before the start of the third (second for House members) legislative session in the full term. Under this simple method, a senator that has served two full sessions has served "at least one-half" of the term of office for purposes of the term limit provision. Likewise, a House member sworn in on or before the start of the second session of the full term has served "at least one-half" of the term.
Under this method, the possible length of any person's time in office will be known from the moment that person is sworn-in. This method precludes most of the potential for manipulation, as the length of a term of office is no longer tied to the exact number of days served in the partial term. Finally, and perhaps most importantly, this method accurately reflects the intent of the voters to limit any one elected official's influence over the legislative process. The "average voter" who voted to approve the term limit initiative surely intended to count the serving of two full Senate sessions, or one full House session, as "at least one-half" of a full term of office. See Op. Att'y Gen. No. 2000-05.
Defining one-half of a term by the start of a legislative session is wholly consistent with the text of Article V, which defines a legislative "term of office" not in terms of days, months or calendar years, but by when the majority party decides to convene the General Assembly. Under this reading, the beginning, middle and end of a term of office are all measured consistently with the start of each legislative session. See C.R.S. § 2-4-101 (2005) ("words and phrases shall be read in context").
While this method greatly reduces the opportunities for manipulation, it does allow for one opportunity to affect a legislator's time in office. If, for example, a person is appointed or elected to fill a vacancy after the second session of a Senate term, the swearing-in date could be intentionally postponed until the second day of the third session, thereby putting them under the "one-half" mark and allowing them to serve an additional four years in office. Given that every other new senator will likely be sworn in the previous day, however, waiting another day to take the oath would surely be viewed as a purely political act. While that circumstance is not at issue here, I previously stated in Formal Opinion 20050-4 that intentional efforts to undermine the term limit laws should not be legally condoned.
 CONCLUSION
For the reasons described above, it is my legal opinion that a person serves "at least one-half of a term of office" in the Colorado Senate if he or she takes the oath of office on or before the first day of the third legislative session of the term that person has been elected or appointed to fill. Likewise, I conclude that a person serves "at least one-half of a term of office" in the Colorado House of Representatives if he or she takes the oath of office on or before the first day of the second legislative session of the term that person has been elected or appointed to fill. This conclusion is supported by the text of the Colorado Constitution, the history surrounding the adoption of the term limit provision, and other rules of constitutional construction described above. I am obligated to construe the term limit provision in such a manner as will prevent an evasion of its ultimate purpose. See Common Cause v.Bledsoe, 810 P.2d 201, 207 (Colo. 1991); Op. Att'y Gen. No. 2005-04 (Aug. 16, 2005), p. 4. This method best serves the voters' intent and the public interest by precluding opportunities for the manipulation of specific legislative terms by those in control of the General Assembly.[7]
Under this analysis, the partial terms served by Senators Joan Fitz-Gerald and Lois Tochtrop count as full terms under Article V. Senator Fitz-Gerald was elected in November 2000 to fill the vacated term of Senator Tony Grampsas. His term began on January 6, 1999, and concluded on January 8, 2003. Senator Fitz-Gerald took office on January 10, 2001, the first day of what would have been Senator Grampsas' third session. Thus, under the rule announced herein, Senator Fitz-Gerald served "at least one-half of a term of office" under Article V.
Senator Tochtrop's partial term also counts as a full term under Article V. She was appointed to fill Senator Alice Nichol's term, which began on January 8, 2003. Senator Tochtrop's partial term began on January 12, 2005, and will end upon the convening of the 2007 session. Because she was sworn-in on or before the start of the third legislative session, her current term counts as "at least one-half of a term of office" for purposes of Article V.
[1] See also Formal Opinion of Attorney General Ken Salazar, No. 2000-05 ("the term `office' in the second sentence appears only to be a shorthand reference to the more specific phrases of the first sentence.").
[2] In contrast, the exact start date and length of a "term of four years" for Governor, Lieutenant Governor, Attorney General, Secretary of State, or Treasurer, is known in advance and is not subject to the will of any elected official. Article IV, Section 1, states that executive officers begin their term on the "second Tuesday of January" in the year following their election, and end on the day the subsequent officer holder is sworn-in.
[3] Audio recordings of this meeting were not available.
[4] At least three other states (Michigan, Nebraska and Louisiana) use the term "one-half" in their constitutional partial term limit provision. The term is not defined by any of those state constitutions, caselaw, or attorney general opinions.
[5] Moreover, counting the number of days served is not consistent with how legislators are paid, which occurs monthly during their term of service and does not factor in the number of days served. For the first January in a term of service, a legislator is paid for the entire month even if the legislator does not take office until January 14 (the latest possible date). Thus, the outgoing legislator, though technically still in office until their successor is sworn-in, is not paid for that portion of January served.
[6] A legislative term officially ends upon the swearing in of the subsequent office holder upon the convening of the General Assembly. For purposes of this analysis, however, the previous day is deemed the final day in office.
[7] This legal opinion applies only to Article V, and should not be construed as applicable to the executive branch offices of Article IV, where the beginning and ending dates of a term of office are more concrete. See
Art. IV, § 1.